A89A0840, A89A0841. TRAVEL AGENCY GROUP, INC. et al. v. HENDERSON MILL TRAVEL, INC. et al.; and vice versa.
(389 SE2d 511)

BEASLEY, Judge.

Appellees Robyn and Edward Uzialko, the owners and sole stockholders of appellee Henderson Mill Travel, Inc. (HMT), a travel agency, negotiated with appellant Pelletier to sell him the accounts and certain assets of their business. Pelletier drafted a purchase agreement for the acquisition, which was rejected by appellees, and a new draft was prepared by their attorney.

Negotiations continued for the next few weeks and various changes were agreed to. The closing of the sale occurred on October 12, 1984, with the execution of agreements, notes, guaranties and covenants. Pelletier and his travel agency, Travel Agency Group, Inc. (TAG), paid $25,000 in cash at closing plus a note to HMT for an additional $35,000 at 10 percent interest payable on January 5, 1985. Pelletier signed as guarantor of TAG's obligations.

The purchase agreement also provided that following the closing sellers would "transfer and assign the A.T.C. license" to buyers in accordance with the terms and provisions of Paragraph 4. These licenses were issued by the Air Traffic Conference (ATC) to travel agencies as a means to implement standardized and uniform rules and regulations governing the purchase of airline tickets and the pay-

ment of the agencies' commissions. Pursuant to the ATC Manual, all licensed agencies are required to secure their obligations to ATC for the sale of cash tickets, usually by means of a surety bond maintained by the owner of the agency.

At the time of closing, HMT maintained such a bond through Robyn Uzialko. HMT's license could not be transferred except upon formal approval by ATC, and the surety bond had to remain in effect until ATC approved the transfer of the license. If these or other material obligations imposed by the ATC Manual were violated or breached by a licensed agency, ATC could direct that the agency's charge plates and ticket stock be removed. Without these a travel agency could neither issue tickets nor receive commissions.

On December 31, 1984, ATC was dissolved and replaced by the Airlines Regulation Commission (ARC), which was operated and regulated in a virtually identical manner. In connection with this changeover, ARC required all ATC licensed travel agencies to execute a transfer card, which would automatically include these agencies as ARC licensees.

Paragraph 4 of the purchase agreement provided: "4. *Ownership of A.T.C. and I.A.T.A. Licenses*: Purchaser acknowledges that the A.T.C. and I.A.T.A. licenses (the 'Licenses') currently utilized by Seller are the property of and registered in the name of Uzialko. For a period of 120 days following the Closing Date, Seller and Uzialko agree to permit Purchaser to operate the Business utilizing the Licenses in the usual and ordinary course of business; provided, however, that *Purchaser shall use its best efforts to apply and qualify with the grantors of the Licenses for the transfer of such Licenses to Purchaser as soon as possible following the Closing Date.* All expenses borne in connection with such transfer shall be the responsibility of Purchaser but *Seller and Uzialko agree to reasonably cooperate in connection with such transfer* and assignment. So long as Purchaser operates under such Licenses, Seller, Uzialko and their representatives shall have full access to the books and records of Purchaser in connection with its operation of the Business and use of such Licenses. Such Licenses shall be used only in the usual and ordinary course of business consistent with past business practices of Seller in the operation of the Business. Purchaser shall be responsible and liable for all accounts payable, expenses, losses, damages and monies owed in connection with the operation of the Business under the Licenses after the Closing Date and shall make payment thereof on a timely basis. In the event such Licenses are not transferred to Purchaser within such 120 day period, then Purchaser shall terminate any use of the Licenses upon the expiration of such 120 day period and shall not operate the Business until such time as Purchaser is issued new licenses by the A.T.C. and I.A.T.A. as sufficient and neces-

sary for the continued operation of the Business. Purchaser acknowledges that under the terms of the Licenses, the Licenses may be terminated at any time by the grantors thereof following the Closing and prior to such grantors' making written consent of the transfer of such Licenses to Purchaser by Uzialko, the Purchaser assumes the full risk of such termination hereunder, except that *any loss of,* or failure to obtain, *said Licenses resulting from the bad faith conduct of Seller or Uzialko shall be deemed a breach of this Agreement* for which Seller and Uzialko agree to indemnify and hold Purchaser harmless for all losses and damages resulting therefrom." (Emphasis supplied.)

Appellants operated the business for the months of October, November and December. Preliminary steps for transfer of the license and security bond were undertaken, but the trial testimony as to what each of the parties did was contradictory. In any event, by letter dated December 4, 1984, the surety company notified HMT and ATC that the bond would be cancelled effective January 15, 1985.

As of January 5, 1985, the date appellants were due to pay the final $35,000 of the purchase price, no transfer of the license had been effected and the surety bond had not been reinstated. At that time, the buyers asserted that the sellers had breached the terms of the purchase agreement by cancelling the surety bond and failing to cooperate in executing the ATC/ARC transfer papers. Sellers demanded payment of the note plus interest, and buyers agreed to pay once the transfer documents were signed and the surety bond was reinstated. Because this did not occur, the bond expired on January 15 and ARC caused HMT's charge plates and ticket stock to be removed, resulting in a significant negative impact on buyers' business.

Buyers sought a declaratory judgment as to their rights and liabilities in regard to payment of the $35,000 note, maintenance of the surety bond, and execution of the ATC/ARC transfer papers. They also sought damages for breach of contract and sellers' allegedly fraudulent alteration of the list of assets of the travel agency to be conveyed. Sellers counterclaimed to recover principal, interest and attorney fees under the note, plus incidental damages involving accounts receivable and payable.

After discovery proceedings and the partial grant of two motions to compel, the case was tried for four days. At the close of plaintiff-buyers' case the trial court directed a verdict against them on their fraud claim. The jury found for appellees-sellers in the principal amount of the note and interest prior to the date of maturity; it awarded costs and attorney fees pursuant to OCGA § 13-6-11 to appellees' trial attorney, but not to the firm representing them during the purchase negotiations. Appellants moved for judgment notwithstanding the verdict, or in the alternative for new trial, which was denied.

The main appeal (A89A0840) is from the denial of appellants' motion. The cross-appeal (A89A0841) is brought by appellees from the judgment entered on the jury verdict.

TAG and Pelletier contend that the verdict was a compromise and therefore illegal; that the refusal of the trial court to charge the jury as requested on ambiguity was so erroneous and prejudicial as to require a new trial; that there was no evidence to support the award of attorney fees; that the trial court erred in directing a verdict on their claim of fraud; and that appellees had waived any right to object to production of certain documents sought in discovery by their failure to file timely answers and objections. The cross-appeal protests the inadequacy of the awards of interest and attorney fees.

1. The trial court was correct to refuse plaintiff-purchasers Request to Charge No. 5, which read:

"I charge you that where the terms of a written contract are ambiguous or uncertain, the meaning of those terms must be determined most strongly against the drafter or maker of the contract. In this case, the contracts as issued were prepared by or on behalf of the Defendants and you must construe the terms of those contracts most strongly against the Defendants Henderson Mill Travel, Inc., Edward Uzialko and Robyn Uzialko." The authority given for this charge is the case of *Polk v. Slaton*, 54 Ga. App. 328 (187 SE 846) (1936).

First, this charge was not adjusted to the evidence. The particular contract provision at issue here, Paragraph 4, was included in part by seller HMT's attorney when he drafted a substitute contract for the one originally submitted by purchaser Pelletier, who was an attorney and acting as such in his own behalf. Then the last sentence regarding bad faith indemnification was added at Pelletier's insistence.

Pelletier even testified, in his cross-examination by sellers' attorney: "that provision had been negotiated between Mr. Aronin (sellers' then attorney) and I over a considerable period of time with a clear understanding that that's what that said. We had two lawyers who sat down with the same thought — . . . ."

Thus the principle of law contained in the submitted charge was inappropriate. Where the legal principle is correct but its recitation is not tailored by the requester to fit the evidence, its rejection by the trial court is not error. *Leverett v. Flint Fuel*, 183 Ga. App. 75, 80 (4) (357 SE2d 882) (1987), citing *Roberson v. Hart*, 148 Ga. App. 343, 345 (251 SE2d 173) (1978). The evidence did not conclusively establish as fact that Paragraph 4 was drafted by defendants, so the requested charge was "not precise and apt." *Ga. Power Co. v. Hinson*, 179 Ga. App. 263, 269 (6b) (346 SE2d 73) (1986).

In the second place, applying the rules of contract construction, there is no ambiguity in Paragraph 4 which needed jury resolution, insofar as what was at issue was concerned.

"[I]t does not follow from the fact that there are two possible interpretations of a contract that the matter automatically becomes a question for the jury. [Cits.]" *Davidson v. Baier Corp.*, 151 Ga. App. 314 (1) (259 SE2d 707) (1979). " '(W)here no dispute of fact is involved, the construction of a plain and definite contract, if needed, is a matter of law for the court; a contract is not ambiguous even though difficult to construe, unless and until an application of the pertinent rules of interpretation leaves it uncertain as to which of two or more possible meanings represents the true intention of the parties. [Cit.]' [Cit.]" *Taylor v. Career Concepts*, 184 Ga. App. 551, 553 (2) (362 SE2d 128) (1987). Thus, the mere fact that the parties here insist that as a matter of law Paragraph 4 either did or did not impose certain obligations on the appellees does not alone create a jury issue.

"If the language of the document was clear and unambiguous, then the trial court was correct in its construction as to its meaning as a matter of law. However, all agreements 'should be determined according to the usual rules for the construction of contracts. [Cit.] The cardinal rule in construing contracts is to ascertain the intention of the parties. [Cits.]" *Crawford v. Crawford*, 158 Ga. App. 187, 188 (279 SE2d 486) (1981). Accord *Olympic Constr. v. Drywall Interiors*, 180 Ga. App. 142 (1) (348 SE2d 688) (1986); *Heyman v. Fin. Properties Developers*, 175 Ga. App. 146 (332 SE2d 893) (1985). " 'There are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, the jury must then resolve the ambiguity. [Cit.]' [Cit.]" *Cincinnati Ins. Co. v. Page*, 188 Ga. App. 876, 878 (374 SE2d 768) (1988). " 'The first requirement of the law relative to contracts is that there must be a meeting of the minds of the parties, and mutuality (cits.), and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon. (Cits.)' " *Demer v. Capital City Cable*, 190 Ga. App. 40, 43 (378 SE2d 162) (1989). " 'Ambiguity in a contract may be defined "as duplicity, indistinctness, an uncertainty of meaning or expression." [Cits.]' " *Taylor v. Estes*, 85 Ga. App. 716, 718 (1) (70 SE2d 82) (1952).

What did need jury resolution was whether the parties performed their obligations under this provision, taken in context. The much-focused-on factual dispute concerning this paragraph in the contract was two-fold. First was whether the loss of the licenses before the expiration of 120 days was the result of "bad faith conduct" of HMT and particularly Robyn Uzialko, either in not cooperating in the purchaser's efforts to have the licenses transferred to it, or in cancelling the surety bond required by the grantors of the licenses before the

end of the 120-day period. Her testimony was that she did all within her control to effect the transfer, that it was actually within her best interest to do so, and that she cancelled the bond because she had been told by purchaser's representative it was all right to do so. Purchaser contradicted this evidence.

The other primary dispute concerning this paragraph was whether the Purchaser used its "best efforts" to effect the transfer promptly after the closing and within the 120-day period. Here again, the evidence was in dispute.

The paragraph explicitly and clearly stated that it was purchaser's responsibility to obtain the transfer and that the seller and Uzialko would "reasonably cooperate" to achieve this. Such is the law even without an express provision, as good faith performance is implicit in every contract. *Crooks v. Chapman Co.*, 124 Ga. App. 718, 719 (3) (185 SE2d 787) (1971). Paragraph 4 did not need a minute description of every step to be taken by each party and the timing thereof to accomplish the clearly intended objective, in order to avoid factual ambiguity.

In sum, what was in dispute was not the meaning of Paragraph 4 but rather its application to the parties' actions after they agreed to it.

Thirdly, the court amply charged the jury on the principles of contract law and breach and gave several rules of construction "to aid the jury" in its construction of the contract: 1) ". . . the surrounding circumstances of a transaction are always proper subjects of proof to aid the jury in the construction of a contract"; 2) ". . . evidence of known and established usage or custom can be admissible to aid in the construction of a contract"; 3) ". . . both attorneys have suggested and talked about during the closing argument that there is a term concerning bad faith conduct that is contained in the contract. Once again, I am not suggesting to you anything about the terms of the contract or how you should construe the contract, but I think it is appropriate for you to understand, under the law what the term 'bad faith' means. . . ."

2. The trial court properly directed a verdict against appellants on their fraud claim, which alleged that appellees' attorney made a false representation to Pelletier at closing which "induced" him to initial, but not to read, a document listing the tangible or physical assets to be included in the sale. Pelletier is an attorney and an experienced businessman and there was no indication that the relationship during negotiations was anything other than an arms-length business undertaking. "One who can read, must read. [Cit.]" *Lovelace v. Figure Salon*, 179 Ga. App. 51, 52 (1) 53 (345 SE2d 139) (1986). "Misrepresentations are not actionable unless the hearer was justified in relying upon them in the exercise of common prudence and diligence.

[Cit.] '(I)n the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations, failure to do which will bar an action based on fraud.' [Cit.]" *Casgar v. C & S Nat. Bank*, 188 Ga. App. 234, 235 (1) (372 SE2d 815) (1988).

3. Appellants also complain of the trial court's refusal to order certain documents to be produced during pretrial discovery. It appears that some or all of these documents have been "missing" since they were sent by courier from the offices of appellants' attorneys to Ed Uzialko after having been in their possession for approximately four weeks. Appellants have not identified which of these documents is material to their case, and the trial court entered two orders in connection with production of any documents, correspondence or memoranda related to Robyn Uzialko's applying for the license and renewing the bond. The court also conducted an in-camera inspection of certain other documents. "Trial courts have broad discretionary powers under the discovery provisions of the Civil Practice Act and appellate courts have consistently refused to interfere with the exercise of a trial court's discretion except in cases of clear abuse. [Cit.]" *Opatut v. Guest Pond Club*, 188 Ga. App. 478, 482 (9) (373 SE2d 372) (1988). There is no abuse evident here.

4. We have reviewed the remaining enumerations in the appeal and cross-appeal and find no basis for reversal.

*Judgments affirmed. Carley, C. J., and McMurray, P. J., concur.*

DECIDED NOVEMBER 22, 1989 —
REHEARING DENIED DECEMBER 14, 1989 —

*Alston & Bird, Peter Q. Bassett, Elizabeth A. Gilley*, for appellants.

*Read, Huddleston & Medori, Eugene A. Medori, Jr.*, for appellees.